332 So.2d 91 (1976)
Salvatore DiGIOVANNI, Appellant,
v.
ALL-PRO GOLF, INC. and John R. Peterson, Appellees.
No. 75-599.
District Court of Appeal of Florida, Second District.
May 12, 1976.
Rehearing Denied June 2, 1976.
*92 Wayne Floyd, Wilson, Wilson & O'Connell, Sarasota, for appellant.
Charles J. Cheves, Jr., Cheves & Hazen, Venice, for appellees.
McNULTY, Chief Judge.
Appellant Salvatore DiGiovanni brings this interlocutory appeal from an order dismissing with prejudice, as sham, his counterclaim to an action brought by appellees, All-Pro Golf, Inc. and John Peterson. He also appeals the vacating of a previous order requiring appellee Peterson, as President of All-Pro Golf, Inc., to produce the financial and business records of the corporation. We reverse.
In 1973, appellee Peterson, a golf professional, and one Belfiore entered into an agreement launching All-Pro Golf, Inc. which operated a golf shop and driving range in Sarasota, Florida. Belfiore, for consideration, secured financing for the venture but did not receive any of its capital stock. Appellant DiGiovanni received twenty-five (25%) percent of the stock in exchange for a $5,000 contribution to capital and appellee Peterson received the remaining seventy-five (75%) percent. One Lavarini, Belfiore's personal secretary, had made several cash advances to Peterson prior to incorporation. All four named participants were made directors of the corporation and a fifth director never became involved in this controversy.
A number of written agreements were executed by the parties in conjunction with the incorporation of the business venture. One of these was a stock pledge agreement which provided that Peterson and the appellant would deposit their stock certificates as security for a $35,000 bank loan initially obtained through, and subsequently assumed by, Belfiore; but apparently the stock certificates were never delivered. The pledge agreement further provided that Belfiore was entitled to sell any of the pledged securities upon failure of All-Pro Golf to repay its indebtedness when due or in the event of a conflict of interest arising between Belfiore and DiGiovanni. Additionally, Belfiore as trustee of a voting trust held the voting rights to all the stock of the corporation.
During 1974, Belfiore and Lavarini became dissatisfied with Peterson's management of the business and decided to call a shareholder's meeting to unseat Peterson. DiGiovanni was informed of the decision and signed his name to a notice of the meeting and to a demand for corporate records. Peterson then filed this suit for injunctive relief and, thereafter, Belfiore caused an answer to be filed together with three counterclaims on behalf, respectively, of himself, DiGiovanni and Lavarini. The record confirms that Belfiore's attorney filed all of the pleadings and DiGiovanni admitted in his deposition that he merely acquiesced in the proceedings. *93 In short, it is undisputed that Belfiore was "calling the shots" and that he and Peterson are the principal protagonists herein.
DiGiovanni's stricken counterclaim was in the nature of a stockholder's derivative suit by which it was sought to bring Peterson, as President and general manager of the corporation, to account for suspected mismanagement. The motion to strike it as sham was based on the fact that Belfiore, who lacked standing as a stockholder, was the real instigator thereof without DiGiovanni's prior knowledge. Additionally, Peterson and the corporation contended that the derivative suit was superfluous or moot because Belfiore had the right to foreclose on DiGiovanni's stock under the terms of the pledge agreement. The trial court agreed; and the order appealed from expressly stated that it was based on a consideration of DiGiovanni's deposition, there being no evidence presented in rebuttal. A prior order requiring the plaintiffs to produce the corporate records was vacated too because of its connection with the now defunct derivative suit; and this latter provision forms the second point on this appeal.
As a prologue, we record that during the pendency of the instant appeal this court was notified that All-Pro Golf, Inc. had been adjudicated bankrupt. We received a copy of an order of the United States District Court for the Middle District of Florida providing for an automatic stay of certain state court proceedings. Thus a preliminary question before us is whether the order of the United States District Court automatically stays this appeal. We think not.
A bankruptcy petition operates as an automatic stay only where the pending state proceeding is founded upon an unsecured provable debt dischargeable under the Bankruptcy Act or is an action against property either in the custody of the Bankruptcy Court or recoverable by the Trustee in Bankruptcy.[1] Clearly the appellant's counterclaim, a stockholder's derivative suit, is not within the ambit of these rules.
Proceeding now to the first of the two issues raised by appellant, we hold that the lower court erred in dismissing the appellant's counterclaim as sham for several reasons. First of all, a motion to dismiss as sham should be granted only upon the convergence of two factors: the absence of any genuine issues of material fact, and a pleading good on the surface but set up in bad faith.[2] Admittedly, DiGiovanni's deposition, which was evidently the only source of evidence considered by the trial court, provides little if any factual support for the allegations of mismanagement set forth in the appellant's counterclaim. But there were other depositions in the court file at the time the motion to strike was heard which the lower court should have considered.[3] For instance, Lavarini, who disbursed the proceeds of the $35,000 loan to the corporation, stated in her deposition that she examined the corporate books for August 1974 and could find no accounts payable book nor could she find any accounting whatsoever of the appellant's contribution to capital. She also observed entries for expenditures which she considered improper or extravagant. Additionally, Peterson admitted in his filed deposition to a lack of familiarity with such details as the amount of aggregate indebtedness of the corporation, the amount of interest payable on outstanding loans, the balance in the corporate checking account and whether the company had made or lost money since its inception. In short, there *94 was sufficient support in the total record to give color to the appellant's claims of mismanagement and breach of fiduciary duties on the part of Peterson.
We are unperturbed by the fact that DiGiovanni, personally, did not have any direct knowledge of specific acts of corporate waste or mismanagement prior to the filing of his counterclaim. Clearly, the real party in interest in a stockholder's derivative suit is the corporation, not the stockholder;[4] so DiGiovanni is simply the "relator" of the corporation in such an action. The source of the information on which the suit is founded is thus of no import. The only requisites for DiGiovanni's standing to bring a stockholders' derivative action in Florida were met in this case: viz., he was a stockholder, both at the time his counterclaim was filed, and during the time the alleged acts of mismanagement occurred.[5] We know of no rule requiring that a complaining stockholder must have conceived all by himself the notion to bring a derivative suit. Moreover, we are equally untroubled by the fact that Belfiore was the impetus behind DeGiovanni's counterclaim. It is enough that the latter acquiesced in the suit, as evidenced by his vigorous appearances in connection therewith and by his diligent prosecution of this appeal.
Lastly, we can find no merit in appellees' contention that DiGiovanni's suit would necessarily be mooted by Belfiore's counterclaim to enforce the stock pledge agreement. Delivery of his stock certificate to Belfiore, pursuant to the pledge agreement, would not divest DeGiovanni of his ownership of the stock nor would Belfiore's "foreclosure" thereof necessarily divest DiGiovanni of his rights of redemption;[6] hence, DiGiovanni would still have standing to prosecute his counterclaim. Furthermore, Belfiore had the right to foreclose selectively, thus a sale or foreclosure of Peterson's stock would not automatically operate as against DiGiovanni's shares. DiGiovanni's counterclaim states a cause of action and should remain viable.
We turn now to the second question raised in this appeal, i.e., whether or not the lower court erred in vacating its prior order compelling Peterson to produce the corporate records for appellant's inspection. Since this order was tied to the court's dismissal of DiGiovanni's counterclaim, we need not reach the question of his rights of inspection independent of this lawsuit.[7] The issue of inspection will, we are sure, be revisited within the context of discovery upon the reinstatement of the appellant's counterclaim.
In view whereof, the order appealed from should be, and it is hereby, reversed; and the cause is remanded for further proceedings not inconsistent herewith.
Reversed.
HOBSON and SCHEB, JJ., concur.
NOTES
[1] Rules of Bankruptcy Procedure, 11 U.S.C. § 29, Rules 401 and 601.
[2] See Guaranty Life Insurance Co. of Florida v. Hall Bros. Press, Inc. (1939), 138 Fla. 176, 189 So. 243; Meadows v. Edwards (Fla. 1955) 82 So.2d 733.
[3] See 1.510(e), R.C.P.
[4] See Koster v. Lumberman's Mutual Casualty Co. (1947), 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067; Citizens National Bank v. Peters (Fla.App.2d, 1965), 175 So.2d 54; Nelson v. Miller (Fla.App.3d, 1968), 212 So.2d 66.
[5] See Section 608.131, F.S. 1973. Indeed, now, under the new Florida General Corporation Act, effective January 1, 1976, one need not even be a stockholder at the time of filing a derivative suit so long as he was one at the time of the transaction complained of. See § 607.147, F.S. 1975.
[6] See Uniform Commercial Code § 679.504, F.S. 1973, re: enforcement or "foreclosure" under a pledge agreement.
[7] See, however, § 607.157, F.S. 1975.