Dudley Warren SCHILLING, Plaintiff-Appellee Cross Appellant,

v.

J. A. BELCHER, Sr., et al., Defendants-Appellants Cross Appellees.

Dudley Warren SCHILLING, Plaintiff-Appellee,

v.

J. A. BELCHER, Sr., et al., Defendants-Appellants.

Nos. 75–3974, 76–1517.

United States Court of Appeals, Fifth Circuit.

Oct. 27, 1978.

Rehearing Denied Dec. 21, 1978.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this case involving Florida law, we hold that a shareholder who sells his stock pending appeal of a favorable judgment in a stockholder's derivative suit against the corporation, loses standing to further prosecute or defend the case, except to the extent the judgment runs personally in his favor, in this case, for attorney's fees.

This stockholder's derivative suit, brought in federal court on the basis of diversity of citizenship, grew out of a family struggle for control of the Belcher Oil Company, a Florida corporation, which generated between $150 and $200 million in annual revenues. Plaintiff Dudley Warren Schilling, a substantial shareholder in the company at the time, sued the company and various directors and officers, seeking (1) a declaration nullifying the 1973 and 1974 directors elections, (2) an award of damages from the individual defendants in favor of the Belcher Oil Company for wrongfully causing the company to purchase 6,378 shares of its own stock at inflated prices, (3) a declaration invalidating the company's employment contract with defendant K. O. Johnson, then president of the company, and (4) an injunction prohibiting defendants from entering into a proposed stock option plan with Johnson.

The district court held in favor of plaintiff on the election fraud and stock purchase issues, but refused to invalidate defendant Johnson's employment contract and stock option plan. In addition to declaratory relief, a judgment of $491,569 was awarded against the individual defendants in favor of the corporation for the illegal stock purchase. Plaintiff was awarded attorney's fees and costs of $140,122, to be deducted from the corporation's judgment.

Defendants appeal these awards and the declaratory relief entered in favor of plaintiff. Plaintiff by cross-appeal attacks that portion of the court's judgment validating defendant Johnson's employment contract and stock option plan.

After trial but before oral argument on this appeal, Coastal States Gas Corporation purchased 100% of Belcher Oil Company stock, including plaintiff Schilling's shares. Having sold his stock, pendente lite, plaintiff Schilling lost his derivative standing to litigate claims on behalf of the corporation. He did not, however, lose standing to defend on appeal the attorney's fee award rendered directly in his favor, and any decision necessary to support the fee award.

For reasons discussed below, (1) plaintiff's $140,122 attorney's fees award is affirmed, (2) the remainder of the court's judgment is vacated, and (3) plaintiff's cross-appeal is dismissed.

The issues presented by this appeal, complicated by posttrial events, require a detailed statement of the facts.

### I. Background

During the period pertinent to this litigation, the Belcher Oil Company was, prior to its recent purchase by Coastal States Gas Corporation, a closely held Florida corporation engaged in selling, transporting, and storing heavy fuel oils. Seventy-four percent of Belcher Oil Company stock was owned by members of three families, the Belchers, the Schillings, and the Lefflers, most of whom are descendents of the company's founders. The remaining stock was owned by approximately 100 shareholders, many of whom are employees or are closely affiliated with one of the principal families.

In April 1971, E. N. "Newt" Belcher, III (Belcher III) succeeded his father, E. N. Belcher, Jr., as president of the company. E. N. Belcher, Jr. served as chairman of the board until his death around Thanksgiving 1971. At that time defendant J. A. "Red" Belcher, Sr. (Belcher Sr.), the brother of E. N. Belcher, Jr., was elected board chairman. In the months that followed, a serious fissure developed between Belcher Sr. and his nephew Belcher III over several matters of company management, and in late 1972 Belcher Sr. resolved to oppose the reelection of Belcher III's management team at the October 1973 annual stockholders meeting. Belcher Sr. enlisted the support of defendants Stewart Allen and J. A. Belcher, Jr. (Belcher Jr., the son of Belcher Sr.), who were board members at all times material to this litigation, and defendant Harlan Snodgrass, a longtime company employee.

## II. The Takeover

The groundwork for the 1973 takeover was apparently laid by Belcher Sr. sometime prior to the 1972 annual stockholders meeting. It was the company's longstanding practice to solicit proxies from stockholders in anticipation of each year's annual meeting. These proxies were always voted in favor of management. The form of the proxies sent out in 1972 varied from past proxies in two significant respects. First, Belcher Sr. insisted that his name be added to that of Belcher III as one of the proxy holders. Second, the 1972 proxies bore the legend: "This proxy is solicited by management for annual meeting on (date)." The attorney who drafted the 1972 proxy later testified at trial that the legend was added to show that the proxy was solicited by and would be voted in favor of existing management. In fact, the proxies were voted for management in the 1972 election.

For the 1973 election, however, in furtherance of their plan to oust Belcher III, defendants secretly began to solicit proxies from certain selected stockholders. Those stockholders not solicited were not informed of defendants' intention to oppose the reelection of management.

Defendants' proxy form bore the names of Belcher Sr. and Belcher Jr. Management's proxy for the 1973 annual meeting was virtually identical to the 1972 management proxy, bearing the names of Belcher Sr. and Belcher III. Although aware that the management proxy carried his name, Belcher Sr. did not inform management of his opposition to its reelection or otherwise afford management an opportunity to remove his name from the management proxy and to resolicit the stockholders for management support in light of the impending fight for control. In fact, in early October Belcher Sr. executed three management proxies covering approximately 30,600 shares of Belcher Oil Company stock held in the Gerhart Trust, of which he and Belcher III were joint trustees, and silently delivered them to management. Not until the actual stockholders meeting and election on October 23, 1973 did defendants disclose their takeover plan to management, the other board members, and the nonsolicited stockholders.

Shortly before the meeting, defendants Belcher Sr., Allen, and Snodgrass tallied up their proxies and concluded that they lacked the voting strength necessary to win the upcoming election. Accordingly, they decided that management proxies listing both Belcher Sr. and Belcher III would not be counted in favor of either faction, a decision which ultimately determined the outcome of the election.

On October 23 defendant Belcher Sr., in his capacity as chairman of the board, called the 1973 annual meeting to order. Although management's report on the year's activities was customarily the first order of business at Belcher Oil Company annual meetings, Belcher Sr. opened the 1973 meeting by calling for the election of directors and appointing defendant Snodgrass to count the votes.

Snodgrass attributed to Belcher Sr.'s faction all proxies returned on defendants' form and all management proxies on which Belcher III's name had been lined out by the signing shareholder. Management proxies on which Belcher Sr.'s name had

been lined out were counted in favor of Belcher III's faction. Pursuant to the pre-arranged decision of defendants Belcher Sr., Allen, and Snodgrass, management proxies on which neither Belcher Sr. nor Belcher III had been lined out were not counted at all. Over 16,000 votes, in addition to the 30,643 votes represented by the Gerhart Trust shares, were nullified on this basis.

After tallying the votes, Snodgrass announced that Belcher Sr. had proxies representing 58.1% of the voting shares. This announcement was repeatedly challenged during the meeting by various shareholders demanding a recount and the right to examine the proxies. Belcher Sr., by invoking his newly acquired 58.1% voting strength, defeated all such motions for a recount. Within three days after the meeting, a number of shareholders again made oral and written demands for proxy inspection and a recount. These demands were likewise refused.

Shortly after the October election, Belcher Sr. reorganized the company's management. Belcher Sr. remained chairman of the board, Snodgrass became president, Belcher Jr. was demoted to a vice-president, and Allen assumed the post of general counsel. In March 1974 defendant K. O. Johnson entered the picture, succeeding the aging Snodgrass as president of the company. A former employee of the Exxon Corporation, Johnson was widely experienced in the oil industry. Included in Johnson's long-term employment contract was a stock option plan under which Johnson was empowered to purchase, over a period of five years, a total of 7,500 shares of Belcher Oil Company stock at $30 per share, substantially less than the fair market value at the time.

By the summer of 1974 it became clear to defendants that the Belcher III faction would seek to regain control of the company at the 1974 annual meeting. Shortly before the October 1974 annual meeting, defendants learned that Belcher III's group was negotiating with three shareholders to buy 6,378 shares of company stock. To keep those votes from falling into Belcher III's hands, the defendants caused the company to purchase the 6,378 shares for $164 and $165 per share, prices which Belcher Sr. later admitted to have been in excess of the stock's fair market value. Defendants timed the stock purchase to enhance their own voting strength in the 1974 election. Proxies covering the 6,387 shares were secured from the sellers before the closing of the company's stock books for record purposes at the election. The purchase itself, however, was postponed until after the company's stock books had been closed. Thus, when the shares were retired to the corporate treasury, Belcher Sr.'s faction kept the proxies and voted them in the 1974 election. The Belcher Sr. faction ultimately won the election by a margin of approximately 23,000 votes. At that October 1974 annual meeting, Johnson's contract and stock option plan were ratified.

### III. Proceedings Below

Plaintiff Dudley Warren Schilling, a resident of North Carolina and longtime shareholder in Belcher Oil Company, filed this stockholder's derivative action on June 1, 1974, almost five months before the 1974 annual stockholders meeting. Plaintiff's complaint asserted the 1973 election was void and all corporate acts by Belcher Sr.'s management team were without authority. He sought, among other things, reinstatement of Belcher III's management team, a declaration that the company's employment contract with Johnson was null and void, and an injunction prohibiting defendants from entering into the proposed stock option plan with Johnson.

At trial, which commenced after the 1974 election and shareholder ratification of Johnson's stock option plan, plaintiff also attacked the validity of the 1974 election and sought damages from defendants on behalf of the corporation for wrongfully causing the corporation to purchase 6,378 shares of its own stock at inflated prices solely to maintain themselves in control.

After a 4-day nonjury trial, the district court (1) declared the 1973 and 1974 elec-

tions null and void; (2) ordered the October 1975 election to be held under the supervision of a court-appointed proctor; (3) declared Johnson's employment contract and stock option plan valid, it having been ratified by the shareholders; (4) entered against the individual defendants a $491,569 judgment to be repaid to the company on behalf of the shareholders as damages for wrongfully causing the corporate purchase of 6,378 shares of company stock; (5) awarded plaintiff attorney's fees and costs of $140,122, to be deducted from the $491,- 569 judgment; and (6) ordered defendants to reimburse the company $29,714 expended in the defense of this suit.

Defendants appeal the court's judgment and award of attorney's fees. On cross-appeal plaintiff attacks that portion of the judgment validating Johnson's stock option plan.

## IV. Standing

While this case was pending on appeal, Coastal States Gas Corporation purchased 100% of the outstanding stock of Belcher Oil Company, including plaintiff Schilling's 1,875 shares. Defendants thereupon moved this Court to vacate the judgments entered against them and to dismiss the action on the ground that plaintiff, having disposed of his shares, had lost his standing to further prosecute a derivative action on behalf of the corporation. Defendants' motion was carried with the case in order to give this Court the benefit of oral argument. We are now of the opinion that defendants' motion should be granted as to all claims against them asserted solely on behalf of the corporation. As to the award of attorney's fees entered in plaintiff's favor, however, plaintiff retains standing to defend it on appeal, together with any judgment which is a necessary predicate to the fee award.

Fed.R.Civ.P. 23.1 contains two discrete standing requirements: (1) the plaintiff must have owned stock in the defendant corporation at the time of the transaction of which he complains, the so-called "contemporaneous ownership" requirement, and (2) the plaintiff must be a shareholder of the defendant corporation at the time suit is brought. The latter requirement, unlike the contemporaneous ownership rule, is not expressly stated in the rule, but rather is implied by the statement that an action under Rule 23.1 may be "brought by one or more shareholders . . . to enforce a right of a corporation." Only a shareholder, by virtue of his "proprietary interest in the corporate enterprise," *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 321, 56 S.Ct. 466, 471, 80 L.Ed. 688 (1936), may "step into the corporation's shoes and . . . seek in its right the restitution he could not demand in his own." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949). Thus, it is generally held that the ownership requirement continues throughout the life of the suit and that the action will abate if the plaintiff ceases to be a shareholder before the litigation ends. C. Wright & A. Miller, 7A Federal Practice and Procedure § 1826, at 325 (1972); *see Tryforos v. Icarian Dev. Co.*, 518 F.2d 1258 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976); *Niesz v. Gorsuch*, 295 F.2d 909 (9th Cir. 1961); 3B Moore's Federal Practice ¶ 23.1.17, at 23.1– 63 (2d ed. 1978); *see also* Annot., 168 A.L.R. 906 (1947).

The inquiry does not end here, however. This case is in federal court on the jurisdictional basis of diversity of citizenship, which injects into the standing issue a complex question of choice of laws.[1] We need

---

1. Current Fed.R.Civ.P. 23.1, adopted in 1966, was derived from former Fed.R.Civ.P. 23(b). The standing requirements for bringing a shareholder's derivative suit in federal court were initially announced, however, by the Supreme Court in *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827 (1882), and were subsequently incorporated into Equity Rule 94. Equity Rule 94 was later replaced by Equity Rule 27, which was in turn replaced by Fed.R.Civ.P. 23(b) in 1938. Not until then had choice of laws been an issue, but 1938 also marked the birth of the *Erie* doctrine, which raised the question whether the standing requirements of Rule 23(b) (now Rule 23.1) would govern over conflicting requirements under the law of the

not now decide the point, however, for we find no conflict in the derivative standing requirements of Florida and federal law.

When this action was filed, standing to bring a stockholder's derivative suit was governed by § 608.131, *Florida Statutes Annotated*,[2] which provided:

> In any action commenced or maintained by a stockholder of any domestic or foreign corporation to procure a judgment in its favor:
>
> (1) It must be made to appear that the plaintiff *is a stockholder of such corporation at the time of bringing the action* and that he was a stockholder of such

corporation at the time of the transaction of which he complains . . . . (emphasis added).

Under the unambiguous language of the statute, only stockholders were permitted to commence and maintain a derivative suit. *Citizens National Bank v. Peters*, 175 So.2d 54 (Fla.Dist.Ct.App.1965); see *DiGiovanni v. All-Pro Golf, Inc.*, 332 So.2d 91 (Fla.Dist. Ct.App.1976) (because pendente lite delivery of plaintiff's stock certificates under pledge agreement would not divest plaintiff of his ownership interest in the stock, plaintiff would retain standing to prosecute stockholder's derivative counterclaim).

---

forum state. The Supreme Court has never resolved the issue, and the lower federal court decisions have not been uniform. *Compare Gallup v. Caldwell*, 120 F.2d 90 (3rd Cir. 1941) and *Piccard v. Sperry Corp.*, 36 F.Supp. 1006 (S.D.N.Y.1941), aff'd *without opinion*, 120 F.2d 328 (2d Cir. 1941) *with Kenrich Corp. v. Miller*, 377 F.2d 312 (3rd Cir. 1967) and *Heit v. Tenneco, Inc.*, 319 F.Supp. 884 (D.Del.1970).

2. **608.131 Stockholders' derivative actions; security for expenses**

In any action commenced or maintained by a stockholder of any domestic or foreign corporation to procure a judgment in its favor:

(1) It must be made to appear that the plaintiff is a stockholder of such corporation at the time of bringing the action and that he was a stockholder of such corporation at the time of the transaction of which he complains, or that his interest devolved upon him by operation of law.

(2) The complaint must set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board of directors of such corporation or the reasons for not having made such effort.

(3) No such action shall be discontinued, compromised or settled without the approval of the court having jurisdiction of the action. Such court in its discretion if it shall determine that the interests of the stockholders of such corporation may be substantially affected thereby, may direct that notice, by publication or otherwise, of such proposed discontinuance, compromise or settlement be given to such stockholders. Stockholders objecting to such settlement must, within a time allowed by the court, show cause why the settlement should not be accepted and approved by the court as fair and reasonable. If notice is so directed to be given the court may determine which one or more of the parties to the action shall bear the expense of giving same in such amount as the court shall determine and find to be reasonable in

the circumstances and the amount of such expense shall be awarded as special costs of the action and recoverable in the same manner as statutory taxable costs.

(4) If the plaintiff or plaintiffs hold less than 5 percent of the outstanding shares or voting trust certificates of such corporation, then unless the stock or voting trust certificates held by such plaintiff or plaintiffs shall then have a fair value in excess of $50,000, such corporation shall be entitled at any stage of the proceedings before final judgment to require the plaintiff or plaintiffs to give security for the reasonable expenses including attorneys' fees which may be incurred by it in connection with such action and by the other parties defendant in connection therewith for which such corporation may become liable under s. 608.13(14), to which security such corporation shall have recourse in such amount as the court having jurisdiction of such action shall determine upon the termination of such action. The amount of such security may thereafter from time to time be increased or decreased in the discretion of such court upon showing that the security provided has or may become inadequate or excessive.

(5) If the action on behalf of the corporation is successful, in whole or in part, or if anything is received by the plaintiff or plaintiffs as the result of a judgment, compromise or settlement, the court may award the plaintiff or plaintiffs the reasonable expenses of maintaining the action, including reasonable attorneys' fees and direct him or them to account to the corporation for the remainder of the proceeds so received by him or them. This subsection shall not apply to any judgment rendered for the benefit of injured shareholders only and limited to a recovery of the loss or damage sustained by them. Fla.Stat.Ann. § 608.131 (West), *superseded by* Fla.Stat.Ann. § 607.147 (West).

When the new Florida General Corporation Act became effective on January 1, 1976, § 608.131 was superseded by § 607.-147,[3] which omitted the language italicized above. One Florida appellate court, apparently noting this change, has suggested in dicta that "now . . . one need not even be a stockholder at the time of filing a derivative suit *so long as he was one at the time of the transaction complained of.*" *DiGiovanni v. All-Pro Golf, Inc.*, 332 So.2d 91, 94 n.5 (Fla.Dist.Ct.App.1976). If this be true, plaintiff Schilling would arguably still have standing under Florida law to prosecute claims on behalf of the corporation since he sold his stock after the effective date of § 607.147. For reasons discussed below, we are convinced that the Florida court's gratuitous dictum did not correctly state the law.

 The purpose of a derivative action is to afford a means by which a stockholder, powerless to bring a direct civil action at law against faithless directors and managers, may seek to vindicate corporate rights that the corporation itself has refused to enforce. As Mr. Justice Jackson observed in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949):

He [the shareholder plaintiff] sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stock-

### 3. 607.147 Shareholders' derivative actions; security for expenses

In any action commenced or maintained by a shareholder of any domestic or foreign corporation to procure a judgment in its favor:

(1) It must be made to appear that the plaintiff was a shareholder or a holder of voting trust certificates at the time of the transaction of which he complains or that his shares or voting trust certificates thereafter devolved upon him by operation of law from a person who was a shareholder or holder of voting trust certificates at such time.

(2) No such action shall be discontinued, compromised, or settled without the approval of the court having jurisdiction of the action. Such court in its discretion, if it shall determine that the interests of the shareholders of such corporation may be substantially affected thereby, may direct that notice, by publication or otherwise, of such proposed discontinuance, *compromise, or settlement* be given to such shareholders. Shareholders objecting to such settlement must, within a time allowed by the court, show cause why the settlement should not be accepted and approved by the court as fair and reasonable. The court may determine which one or more *of the parties to the action shall bear the* expense of giving notice in such amount as the court shall determine and find to be reasonable in the circumstances, and the amount of such expense shall be awarded as special costs of the action and recoverable in the same manner as statutory taxable costs.

(3) If the *plaintiff or plaintiffs hold less* than 5 percent of the outstanding shares or voting trust certificates of such corporation, then, unless the stock or voting trust certificates held by such plaintiff or plaintiffs shall then have a fair value in excess of $50,000, the court may at any time before final judgment require the plaintiff or plaintiffs to give security for the reasonable expenses, including attorneys' fees, which may be incurred by the corporation in connection with such action and by the other parties defendant in connection therewith for which such corporation may become legally liable, to which security such corporation shall have recourse in such amount as the court having jurisdiction of such action shall determine upon the termination of such action. The amount of such security may thereafter from time to time be increased or decreased in the discretion of such court upon showing that the security provided has or may become inadequate or excessive.

(4) If the court having jurisdiction of such action upon final judgment shall find that the action was brought without reasonable cause, such court may require the plaintiff or plaintiffs to pay the parties named as defendant the reasonable expenses, including fees of attorneys, incurred by them in the defense of such action.

(5) If the action on behalf of the corporation is successful, in whole or in part, or if anything is received by the plaintiff or plaintiffs *as the result of a judgment, compromise,* or settlement, the court may award the plaintiff or plaintiffs the reasonable expenses of maintaining the action, including reasonable attorneys' fees, and direct him or them to account to the corporation for the remainder of the proceeds so received by him or them. This subsection shall not apply to any judgment rendered for the benefit of injured shareholders only and limited to a recovery of the loss or damage sustained by them. Fla.Stat.Ann. § 607.147 (West).

holders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion.

■ Thus, "[s]tanding [to bring a derivative action in behalf of a corporation] is justified only by [the] proprietary interest created by the stockholder relationship and the possible indirect benefits the nominal plaintiff may acquire *qua* stockholder of the corporation which is the real party in interest." *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 735–736 (3rd Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). A close reading of § 607.147 persuades us that Florida has not chosen to entrust the heavy responsibility of vindicating unenforced corporate rights to a representative who is no longer a member of the class which will benefit or suffer from his actions.[4]

First, § 607.147 is headed *"Shareholders'* derivative actions," which clearly contemplates that derivative actions governed by the statute will be brought by shareholders. Second, § 607.147 contains a security-for-costs provision which comes into play only "[i]f the plaintiff or plaintiffs hold less than 5 percent of the outstanding shares . . of such corporation," a requirement which assumes that plaintiff owns *some* shares in the corporation. Third, and most important, the first sentence of § 607.147, like its predecessor § 608.131, provides that the statute governs "any action *commended or maintained by a shareholder* of any domestic or foreign corporation to procure a judgment in its favor." In light of this provision, it is clear that the language of former § 608.131 expressly requiring stock ownership at the time suit is filed was mere surplusage and that its omission from § 607.147 was not intended to do away with

the *sine qua non* of stockholder's derivative actions.

## V. Collusive Jurisdiction

Closely intertwined with the issue of standing is defendants' contention that plaintiff Schilling was collusively joined to invoke federal diversity jurisdiction, a violation of 28 U.S.C.A. § 1359.[5] To prevail on this contention, defendants' first task is to prove that someone other than plaintiff Schilling was in control of the lawsuit. In this effort defendants note that plaintiff Schilling did not directly enter into a contract of employment with the attorneys representing him and that Belcher III agreed to "underwrite" plaintiff's counsel fees and costs and has in fact financed approximately 80% of the expenses of this litigation. From these facts, defendants argue, it follows that Belcher III was in command of this suit, for "He who pays the piper calls the tune." We find the converse of the ancient epigram insufficient to carry the day on this point.

■ That the nominal plaintiff was solicited to bring suit and was indemnified against liability for costs and counsel fees is not, by itself, proof of collusion. *Wheeler v. Denver*, 229 U.S. 342, 33 S.Ct. 842, 57 L.Ed. 1219 (1913). It must appear that "the suit . . . is in reality the suit of [a nonparty], with a party plaintiff 'collusively made,' 'for the purpose of creating a [federal] case.'" *Cashman v. Amador & Sacramento Canal Co.*, 118 U.S. 58, 61, 6 S.Ct. 926, 928, 30 L.Ed. 72 (1886); *see Amar v. Garnier Enterprises, Inc.*, 41 F.R.D. 211 (C.D.Cal. 1966) (nondiverse shareholder solicited diverse nominal plaintiff *to become* shareholder and thereafter bring derivative action; nominal plaintiff purchased minimum number of shares, 16, that would satisfy the $10,000 jurisdictional requirement).

---

4. Under some circumstances a former shareholder may have a direct cause of action upon a claim that is normally derivative in nature if he parted with his shares without knowledge of the alleged prior wrongful transactions. *See Watson v. Button*, 235 F.2d 235 (9th Cir. 1956).

5. **§ 1359. Parties collusively joined or made**

 A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

 28 U.S.C.A. § 1359.

Plaintiff Schilling is a long time resident of North Carolina and, prior to selling his stock to Coastal States, was a longstanding and substantial shareholder in the Belcher Oil Company. When this suit was filed, plaintiff had a legitimate interest in correcting unlawful and improper corporate practices. At oral argument defense counsel acknowledged that plaintiff Schilling had power to dismiss this action at any time. *Cf. Cashman v. Amador & Sacramento Canal Co.*, 118 U.S. 58, 60, 6 S.Ct. 926, 30 L.Ed. 72 (1886) (Collusive diversity jurisdiction found where nonresident plaintiff, who had been solicited to bring suit and indemnified against the expenses of litigation by the County of Sacramento, agreed "not to compromise, dismiss, or settle the said suit without the consent of the County of Sacramento, and to allow the said county and the attorneys aforesaid in its behalf to manage and conduct the said suit to the same extent and in the same manner as if such suit had been commenced by and was prosecuted in the name of the said County of Sacramento.").

■ In sum, defendants have failed to show that plaintiff Schilling was "improperly or collusively made or joined" to invoke federal diversity jurisdiction. Nevertheless, when plaintiff Schilling sold his stock in Belcher Oil Company, he lost his indirect interest as a stockholder in a corporate recovery and, hence, lost his derivative standing to litigate claims on behalf of the corporation. He did not, however, lose his standing to defend on appeal the $140,122 attorney's fees judgment, which runs directly in his favor, and any judgment which was a necessary predicate to the fee award. *Tryforos v. Icarian Dev. Co.*, 518 F.2d 1258 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976).

## VI. Attorney's Fees

■ Because this is a diversity case, the validity of the fee award must be tested under Florida law. *Id.* at 1265; *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Cohen v. Beneficial In-*

*dus. Loan Corp.*, 337 U.S. 541, 555–557, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Section 607.147(5), *Florida Statutes Annotated*, which incorporates unchanged the language of former § 608.131(5), *Florida Statutes Annotated*, provides in pertinent part:

> (5) If the action on behalf of the corporation is successful, in whole or in part, or if anything is received by the plaintiff or plaintiffs as the result of a judgment, compromise or settlement, the court may award the plaintiff or plaintiffs the reasonable expenses of maintaining the action, including reasonable attorneys' fees and direct him or them to account to the corporation for the remainder of the proceeds so received by him or them.

Florida courts have interpreted this language to mean that an award of attorney's fees may be made only out of the fund recovered for the corporation. *See Brown v. Epstein*, 227 So.2d 245 (Fla.Dist.Ct.App. 1969). Accordingly, the validity of Schilling's counsel fee award depends in part upon the appellate success or failure of the $491,569 judgment rendered in favor of the corporation. Thus, despite his loss of derivative standing to pursue corporate claims, Schilling has a direct and substantial interest in the corporation's money judgment and, therefore, has standing to defend it on appeal.

We therefore consider first the validity of the corporation's money judgment before turning to defendants' separate attack on the attorney's fee award.

### A. The $491,569 Corporate Judgment

Shortly before the October 1974 annual meeting, the individual defendants, sensing an upcoming proxy fight with the Belcher III faction, caused the corporation to expend $1,048,369 in corporate funds to purchase 6,378 shares of Belcher Oil Company stock at admittedly inflated prices of $164 and $165 per share. Defendants shrewdly timed the purchase so that they were able to vote these shares at the 1974 meeting. The district court held the stock purchase an illegal misuse of corporate funds and, based on uncontested expert testimony that

the stock had a fair market value at the time of sale of $58.20 to $87.30 per share, entered judgment in favor of the corporation for $491,569, the difference between the total price paid for the shares and the total fair market value of the shares computed at $87.30 per share.

Relying on two Delaware cases, *Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136 (1960) and *Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548 (1964), defendants argue that directors may in the exercise of their honest business judgment adopt any lawful means of eliminating what appears to them a clear threat to their business. By ordering the stock purchase, defendants were merely seeking to defeat the "raid" attempted by Belcher III's group, which, if successful, would have been ruinous to the company. A brief look at the facts of these Delaware cases, however, shows that defendants' reliance is misplaced.

Both *Kors* and *Cheff* were stockholder's derivative actions in which the plaintiff sought to hold directors liable for corporate losses allegedly incurred when the directors caused the corporation to purchase its own shares at inflated prices. In both cases outside interests had acquired substantial equity positions in the corporations and were threatening to take control and to effect radical changes in corporate policy.

In *Kors* the directors of the Lehn & Fink Products Corporation authorized the purchase of Lehn & Fink stock in an effort to prevent control of the corporation from falling into the hands of a man whose "business methods . . ., which stress[ed] . . . a readiness to sacrifice an established mode of doing business for quick profits, presented a threat of a possible future business course which was entirely at odds with Lehn & Fink's traditions." *Kors v. Carey*, 158 A.2d at 141. Finding no evidence that the directors acted out of a selfish desire to maintain themselves in office, the court held the stock purchase to be a valid means of repelling a clear threat to the future of the company's business.

In *Cheff* a takeover of the Holland Furnace Company was threatened by a notorious raider whose modus operandi was "to achieve quick profits by sales or liquidations of companies acquired by him." *Cheff v. Mathes*, 199 A.2d at 552. The court rejected plaintiff's contention that defendants had directed the purchase of Holland shares with corporate funds in order to perpetuate their control of the company, holding that the stock purchase was a legitimate response to "a reasonable threat to the continued existence of Holland, or at least existence in its present form . . . ." *Id.* at 556.

The case at bar is distinguishable from *Kors* and *Cheff* in two regards. First, although defendants contend that the stock purchase was necessary "to meet the real and immediate threat to the corporation," they make no attempt to explain what that threat was. The only record evidence we are referred to is defendant Johnson's vague testimony that it would have been disastrous to displace existing management at a time when the oil business was reeling from the effects of the Arab embargo and emergency government controls. Nowhere do defendants allege that Belcher III intended to implement radical changes in corporate policy, strip the corporation of its assets, or otherwise alter the corporation's business structure. Consequently, defendants have failed to carry their burden of proving that the purchase was made primarily in the corporate interest. *Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548 (1964); *Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405 (1962); 6A W. Fletcher, Cyclopedia of the Law of Private Corporations § 2850, at 378 (rev. perm. ed. 1968).

Second, Belcher III was hardly an outsider. In contrast to the corporate raiders involved in *Kors* and *Cheff*, Belcher III and his supporters can trace their very substantial—approximately 45%—ownership interest in the Belcher Oil Company back to the corporation's founding.

In this case the district court found that defendants' primary purpose in directing the company to purchase and retire its own shares was to perpetuate their control of the company, which, in those states that

have considered the issue, is an unlawful misuse of corporate funds. *See, e. g., McPhail v. L. S. Starrett Co.*, 257 F.2d 388 (1st Cir. 1958); *Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548 (1964); *Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405 (Del.Ch.1962); *Anderson v. Albert & J. M. Anderson Manufacturing Co.*, 325 Mass. 343, 90 N.E.2d 541 (1950); 6A W. Fletcher, Cyclopedia of the Law of Private Corporations § 2850, at 378 (rev. perm. ed. 1968). Supported by ample evidence in the record, this finding is not clearly erroneous. We agree with the district court that the courts of Florida would hold directors liable for corporate losses resulting from practices primarily designed to maintain the directors in control. *Cf., e. g., Biltmore Motor Corp. v. Roque*, 291 So.2d 114 (Fla.Dist.Ct.App.1974) (court ordered revocation of corporate recapitalization because defendant directors' primary purpose in recapitalizing the company was to oust the plaintiff as a stockholder).

Defendants next attack the corporation's money judgment on the ground that the company suffered no damage as a result of the stock purchase. While conceding that the purchase price of $165 a share may have exceeded the stock's fair market value, defendants attempt to cleanse the transaction with the explanation that the stock simply could not be bought for less. Implicit in defendants' explanation is the admission that in their haste to retain control of the company, they were prepared to authorize the expenditure of corporate funds to purchase all available Belcher Oil Company stock regardless of price. The short answer to defendants' argument is that the company did not *have* to buy the stock.

Nor does the fact that the market value of Belcher Oil Company stock subsequently reached and exceeded the $165 a share purchase price relieve defendants of liability. The company suffered damage at the moment corporate funds were knowingly used to purchase overpriced assets for an unlawful purpose.

Finally, defendants contend that the validity of the 1974 election of directors and the legality of the corporation's 1974 stock purchase were issues not raised by the pleadings nor tried with either the express or implied consent of the parties. The complaint in this case was filed prior to the disputed stock purchase and the 1974 election and therefore contains no reference to those events. In their amended answer and a subsequent motion to dismiss, however, defendants themselves set up the 1974 election as a defense to any wrongdoing regarding the 1973 election, arguing that their reelection in 1974 mooted plaintiff's claims regarding the earlier election. The validity of the 1974 election and its legal impact on the 1973 election were subsequently listed in a pretrial stipulation as issues to be determined by the court.[6] Having thus raised the question of the validity of the 1974 election, defendants raised all issues bearing on the resolution of that question, including the legality of the corporation's stock purchase.

■ We conclude that the district court did not commit reversible error in entering judgment against defendants for damages resulting to the corporation from the October 1974 purchase of Belcher Oil Company stock.

**B. Attorney's Fees**

As a result of plaintiff's efforts in this case, a free and fair corporate election was held in 1975 under the supervision of a court-appointed proctor and a judgment of

---

**6.** The issues of fact which the plaintiff claims and the defendants deny remain to be litigated at trial are:

⋅ ⋅ ⋅ ⋅ ⋅

(t) Whether on October 22, 1974 at the following annual stockholders meeting, a majority of the shareholders of Belcher Oil Company re-elected the same board of directors which was elected at the 1973 annual stockholders meeting.

The issues of law which remain for determination by the Court are:

⋅ ⋅ ⋅ ⋅ ⋅

(h) Whether the election and activities of the board of directors at the stockholders meeting of October 23, 1973 has been approved, ratified and confirmed by the plaintiff.

Pretrial Stipulation, App. at 77–79.

$491,569 was awarded in favor of the corporation. Clearly, plaintiff's derivative action on behalf of the corporation was "successful," a necessary predicate to an award of reasonable costs and attorney's fees under § 607.147(5), *Florida Statutes Annotated*.

Noting that plaintiff Schilling did not enter into a contractual relationship with his attorneys and that he has incurred little or no out-of-pocket expense in the prosecution of this case, defendants urge that Schilling is not entitled to be unjustly enriched by an award of counsel fees in his favor. Nor, argue defendants, should he be permitted to accept such an award and assign it to Belcher III, who admittedly "agreed to underwrite Mr. Schilling in this matter" and has financed approximately 80% of the expenses of this litigation.

The well-established practice of awarding costs and attorney's fees to successful plaintiffs in stockholder derivative suits is supported by two important policies. First, since all shareholders benefit in the same manner and to the same extent as the plaintiff, allowing the other shareholders to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would unjustly enrich them at the plaintiff's expense. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Second, reimbursement of expenses serves to encourage meritorious derivative suits by the small shareholder whose expenses would normally exceed any increase in the value of his holdings resulting from a successful litigation. As one commentator has put it:

> The liberal allowance of counsel fees to the champion of the rights of a group is the dynamic factor giving the necessary impetus and incentive to the volunteer method of representation in class and derivative suits. Otherwise no one individual stockholder could afford to begin a suit of such size and difficulty or undertake to resist an unfair settlement.

13 W. Fletcher, Cyclopedia of the Law of Private Corporations § 6045, at 563 (rev. perm. ed. 1968).

The promise of reimbursement by itself, however, is generally an insufficient economic base from which shareholders of limited means can battle great corporations, for lawyers usually must be paid as litigation proceeds. Few plaintiffs can afford to pay the ever-increasing tab, which frequently runs into hundreds of thousands of dollars, while patiently and prayerfully awaiting court-ordered reimbursement. Thus, the economic realities of modern legal warfare require the would-be plaintiff either to engage his attorneys on a contingency fee or deferred payment basis or to seek financial assistance from those he proposes to represent. Equitable if not legal claims to any court-ordered reimbursement are created on behalf of those contributing to the joint effort, and the counsel fee award is merely the fund out of which these claims must be satisfied.

██ In this case both Belcher III and Schilling's attorneys, and perhaps others, have substantial claims against the $140,122 counsel fee award. There is no merit to defendants' argument that plaintiff will be unjustly enriched as a result of the award.

### Disposition

We conclude (1) that the sale of plaintiff's stock destroyed his derivative standing to prosecute corporate claims, but did not affect his direct standing to defend on appeal the counsel fee judgment rendered in his favor, an issue which required resolution of the merits of the attack on the $491,569 corporate judgment, (2) that the trial court properly held defendants liable in damages for losses resulting to the corporation from the 1974 stock purchase, and (3) that plaintiff was properly awarded reasonable costs and attorney's fees. Accordingly, we affirm that portion of the district court's judgment awarding plaintiff $140,-122 in reasonable attorney's fees and costs and awarding the corporation $491,569 to reimburse it for corporate funds wrongfully expended by defendants. Plaintiff's loss of derivative standing requires that the district court's judgment be vacated insofar as it (1) declares the 1973 and 1974 elections

null and void, and (2) orders defendants to reimburse the Belcher Oil Company $29,714 expended in the defense of this suit. Likewise, plaintiff's appeal of the district court's judgment validating defendant Johnson's employment contract and stock option plan must be dismissed in light of plaintiff's loss of derivative standing. Finally, the $491,569 judgment rendered in favor of Belcher Oil Company is vacated to the extent it exceeds plaintiff's $140,122 award of attorney's fees and costs.

AFFIRMED IN PART,

VACATED IN PART.