64 F.3d 1439
 32 Fed.R.Serv.3d 790
 Diane ROSENBAUM, on behalf of herself and all others
similarly situated; Pamela Cagan, derivatively on
behalf of US West, Inc., Plaintiffs-Appellees,
Drake G. Russell, Appellant,
v.
Jack MacALLISTER, Richard D. McCormick, A. Gary Ames, US
West, Inc., Richard J. Callahan, Howard P. Doerr,
Defendants.
 No. 93-1498.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 15, 1995.
 
 Dirk T. Biermann of Biermann & Fretz, and Donald Salcito of Ballard Spahr Andrews & Ingersoll (Joseph H. Fretz of Biermann & Fretz, and David B. Kelly of Ballard Spahr Andrews & Ingersoll, with them on the briefs), Denver, CO, for appellant Drake G. Russell.
 Judith L. Spanier (Arthur N. Abbey, also of Abbey & Ellis, New York City; Gerald L. Bader, Jr. and Renee B. Taylor of Bader & Villanueva, Denver, CO; and James V. Bashian, New York City, with her on the briefs), for plaintiffs-appellees.
 Before HENRY and LOGAN, Circuit Judges, and REED, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 In this appeal we are asked to determine whether the district court abused its discretion in awarding plaintiffs' counsel $2,500,000 attorney's fees and $100,000 expenses, to be paid by US West, Inc., based on the settlement reached in a combined class action and derivative suit against US West and certain of its officers and directors. Drake G. Russell, an unnamed class member who is also a US West shareholder, made written and oral objections in the district court, not to the settlement itself, but to the amount of attorney's fees sought in the settlement agreement and ultimately granted by the court. He did not attempt to intervene in the underlying suit. The first issue on appeal is whether Russell has standing to appeal the district court's fee award to plaintiffs' counsel. We hold that he does have standing, and that the district court erred and must reconsider its fee award.
 
 
 2
 Plaintiff Diane Rosenbaum initiated the class action suit under Fed.R.Civ.P. 23(b)(3), alleging violations of federal securities laws under the Securities Act of 1933 and the Securities Exchange Act of 1934 for false statements and omissions by defendants affecting the market value of US West stock. The complaint was later amended to add another plaintiff, Pamela Cagan, and a derivative claim under Fed.R.Civ.P. 23.1 on behalf of US West against the same individual defendants. The derivative claim alleged that the individual defendants breached their fiduciary duties and wasted corporate assets in connection with the transactions and nondisclosures specified in the class action complaint.
 
 
 3
 The parties began negotiations toward a possible settlement, and the district court certified a class of US West shareholders who purchased common stock between February 15, 1990, and March 6, 1992. After discovery the parties entered a stipulation of settlement. The district court held a hearing to review the stipulation and the settlement notices proposed to be sent to the class members and, for the derivative suit, to US West shareholders of record.
 
 
 4
 At a settlement hearing in November 1993, the district court determined that the class members and current shareholders were given adequate notice as required by Rules 23 and 23.1. The district court then heard from attorneys for the named class representatives, the shareholders, US West, and the individual defendants. Attorneys appeared on behalf of Russell, who had filed a written objection to the attorney's fees sought in the settlement proposal, and argued that the benefit to the shareholders did not justify $2,500,000 in attorney's fees. The district court, however, approved the settlement after finding it was fair, adequate and reasonable, and awarded plaintiffs' counsel fees of $2,500,000 and expenses of $100,000.
 
 
 5
 Russell appeals, asserting that the attorney's fee award was excessive, and that the district court erred in denying his motion for an evidentiary hearing on that award.[1]
 
 
 6
 * We may address the attorney's fee issue only if Russell has standing to bring this appeal. He asserts that he has standing both as a member of the class who purchased stock during the class period and as a US West shareholder.
 
 
 7
 The issue whether a class member must intervene in the underlying suit to have standing to challenge approval of a settlement has split the circuits. Compare Shults v. Champion Int'l Corp., 35 F.3d 1056 (6th Cir.1994) (requiring intervention); Croyden Assocs. v. Alleco, Inc., 969 F.2d 675, 679-81 (8th Cir.1992), (same) cert. denied, --- U.S. ----, 113 S.Ct. 1251, 122 L.Ed.2d 650 (1993); Walker v. City of Mesquite, 858 F.2d 1071, 1074 (5th Cir.1988) (same); Guthrie v. Evans, 815 F.2d 626, 628-29 (11th Cir.1987) (same) with Carlough v. Amchem Prods., Inc., 5 F.3d 707, 713-14 (3d Cir.1993) (no intervention required); Armstrong v. Board of Sch. Directors, 616 F.2d 305, 327-28 (7th Cir.1980) (same). This court has recently joined the circuits that require intervention by a class member in a Rule 23(b)(3) case in order to have standing to appeal the district court's approval of the settlement. Gottlieb v. Wiles, 11 F.3d 1004 (10th Cir.1993). Although Russell asks us to overturn that decision, as a panel we cannot; it would require a decision of the court sitting en banc. The Gottlieb v. Wiles case, however, did not involve, or necessarily preclude, nonintervenor Russell's right to appeal the derivative settlement. Indeed, the decision, by its analysis distinguishing shareholders' derivative suits and Bell Atlantic Corp. v. Bolger, 2 F.3d 1304 (3d Cir.1993), might be read to support Russell's standing to appeal the derivative suit portion of the settlement agreement.
 
 
 8
 But Russell does not question the validity of the settlement agreement itself, only the court's award of attorney's fees. We believe that the most important rationales underpinning the rule that only intervenors may appeal the approval of the settlement itself do not apply to appeals of awards of attorney's fees and expenses to class counsel, even when the defendant agrees to the amount of the fees in the settlement agreement.
 
 
 9
 The purpose of Rule 23, and class actions generally, is to unify and render manageable litigation in which there are many members of a homogeneous class with common claims against a defendant. Before certifying a class the court must find that the one who seeks to be its representative is typical of the class and is likely to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). A class member who wishes to intervene must challenge the ability of the certified representative to represent the class as a whole. These Rule 23 requirements in part are for the benefit of the defendant, to allow it to settle in one suit its liability to all members of the class who have not opted out and thus put the case behind it.
 
 
 10
 To allow a nonintervening class member to appeal approval of a settlement would permit one dissident--and there is likely always to be one--to postpone realization of any of the benefits that might otherwise come to the class members and to prevent the defendant from settling its liability. To be sure a member of a Rule 23(b)(3) class may opt out in favor of individual litigation with the defendant; but that is seldom a major worry to the defendant because the individual claims are generally small and their costs of litigation are high.
 
 
 11
 To allow an individual dissident class member who did not intervene to appeal an attorney's fee award would not be nearly as disruptive. It would not affect the defendant who has paid into court or made other concessions necessary to settle the case. In the usual case, in which the settlement creates a fund to be shared by the plaintiff class, all of the assets the court would have ordered distributed to the class members could be distributed despite the appeal. The only result of allowing the appeal would be to delay the payment of fees and expenses to the attorneys for the plaintiff class. Should the dissident's appeal succeed in reducing those fees, there would be additional funds for later distribution to the class members.
 
 
 12
 It seems proper to allow the nonintervenor class member to appeal for at least three reasons: First, the ability of the class representative to adequately represent the other class members is likely to break down when the issue is the appropriate fee for her own lawyers. Indeed, it is sometimes the lawyers who recruit the class representative and initiate the suit. In any event, that the named class representative will resist an excessive fee request by her own lawyers is not nearly as plain as whether that representative, with the assistance of the lawyers, will negotiate or litigate fairly for the class against an allegedly wrongdoing defendant.
 
 
 13
 Second, class members notified of a proposed settlement are informed of the recovery against the defendant but often only informed of an outside limit for attorney's fees. For example, in the instant case the notice stated only that "Plaintiffs' lawyers may ask for up to $2,500,000 in fees and $100,000 in expenses." Appellant's App. 309; see also id. at 288, 316 ("not be in the aggregate greater than $2,500,000 for fees and $100,000 for ... expenses"). The expectation is that the fees will be set by the court upon consideration of the evidence, including the objections of nonintervening class members. We do not believe that a class member who is satisfied with the settlement should have to intervene because of the possibility the court might award an unreasonable attorney's fee.
 
 
 14
 Third, the opt out feature of Rule 23(b)(3) class actions seems inoperable in the context of a member satisfied with the settlement generally, but potentially dissatisfied with the attorney's fee award. By the time the member knows the amount of the fee the court awards the time to opt out has expired.
 
 
 15
 The same considerations apply even more clearly in the context of a shareholders' derivative suit in which the nonparty shareholder wishes to appeal only the fee allowed the party shareholder's attorney in a settlement. There is no opt out possibility. The benefits of the settlement inure to the corporation and hence only indirectly to the shareholder.[2] The attorneys for the named representative are entitled to a fair fee; but an appeal of the court's fee award--to be paid out of the corporate treasury--would seem not to delay the benefits of the settlement.
 
 
 16
 For the reasons stated, we hold that Russell, the nonintervenor class member and shareholder who made written and oral objections at the fee hearing, has standing to appeal the court's award of attorney's fees and expenses to the plaintiffs' attorneys.
 
 II
 
 17
 We turn now to the merits: Russell's objections to the attorney's fee award. Before determining the attorney's fee award, the district court summarized the settlement terms:
 
 
 18
 [T]he class members are vested with a right to purchase certain shares of stock in US West at a three percent discount and absent the payment of brokerage fees and expenses determined by the formula set forth in detail in the parties' settlement.
 
 
 19
 In addition there was secured through negotiation with certain insurance carriers the payment of $3.5 million in insurance proceeds and a waiver of a $1 million deductible, rendering a benefit of true value of $4.5 million.
 
 
 20
 Finally, the settlement requires the implementation of certain therapeutic corporate governance measures through the Corporate Development and Finance Committee, the Public Policy Committee, the Human Resources Committee and the Audit Committee directed specifically to the conduct of the corporate business giving rise to the claims made the subject matter of this action, so as to define standards of future corporate governance against which the actions of the directors and officers may reasonably be measured.
 
 
 21
 Appellant's App. 511; see also Stipulation of Settlement, id. at 96-134.
 
 
 22
 The court then discussed the value of the benefits gained, and essentially applied both a common fund and a lodestar-type analysis. The district court concluded that an attorney's fee of $2,500,000 was reasonable.
 
 
 23
 Objector Russell argues that the award of attorney's fees was improper, asserting that the settlement primarily benefitted the class members; therefore, the fees should not be shifted so that the corporation (thus, the shareholders) pays them. Alternatively, he asserts that even if the corporation/shareholders benefitted enough to require the corporation to pay the attorney's fee award, those fees should be based on an unenhanced lodestar rather than a percentage of the fund. We review the award of attorney's fees for abuse of discretion, Gottlieb v. Barry, 43 F.3d 474, 486 (10th Cir.1994); "[h]owever, 'the court's legal analysis which provides the basis for the fee award is reviewable de novo.' " Aguinaga v. United Food and Commercial Workers Int'l Union, 993 F.2d 1480, 1481 (10th Cir.1993) (quoting Homeward Bound, Inc. v. Hissom Memorial Ctr., 963 F.2d 1352, 1355 (10th Cir.1992)).
 
 
 24
 The award of attorney's fees to plaintiffs in class action and derivative suits is based upon the common benefit doctrine, an exception to the American Rule that prevailing litigants must pay their own attorneys' fees. Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). It applies where "the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.' " Id. at 5, 93 S.Ct. at 1946 (quoting Mills v. Electric Auto-Lite Co., 396 U.S. 375, 393-94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970)). The common benefit doctrine originates from the common fund exception, under which "the successful plaintiff is awarded attorney fees because his suit creates 'a common fund, the economic benefit of which is shared by all members of the class.' " Aguinaga, 993 F.2d at 1482 (quoting Hall, 412 U.S. at 5 n. 7, 93 S.Ct. at 1946 n. 7).
 
 
 25
 "The common fund doctrine 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.' " Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir.) (quoting Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980)), cert. denied, 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). When the common benefit is a fund, fees are "extracted from the predetermined damage recovery rather than obtained from the losing party." Id. Thus when a class action yields a fund for class members, fees may be paid from the recovery. See Boeing Co., 444 U.S. at 481, 100 S.Ct. at 750. Similarly, in a typical shareholder derivative suit, "the successful shareholder plaintiff confers a substantial benefit on all of the shareholders of the defendant corporation. Any fees assessed against the corporation can be spread proportionately among all of the shareholders, who are the real beneficiaries of the litigation, because the corporation is the alter ego of the shareholders." Johnson v. U.S. Dep't of HUD, 939 F.2d 586, 590 (8th Cir.1991).
 
 
 26
 The district court acknowledged Russell's argument that in common fund cases, the fees are spread evenly among all those who benefit in proportion to the benefit, whereas here US West pays the entire fee even though the class members received more relief than the shareholders. The district court, however, accepted plaintiffs' counsels' argument that the therapeutic relief was a substantial benefit to both the shareholders and class members. The court did not appear concerned that the class members may have received a benefit--discount purchase rights--that nonmember shareholders did not receive. Other circuits, however, have rejected fee awards in class action suits against corporations on the ground that any benefit of the class action accrued only to class members, not to the corporation itself or its shareholders in general. See Christensen v. Kiewit-Murdock Inv. Corp., 815 F.2d 206, 211 (2d Cir.), cert. denied, 484 U.S. 908, 108 S.Ct. 250, 98 L.Ed.2d 209 (1987) (class action by shareholders of certain classes of stock opposing merger agreement; in response board revised merger plan); cf. O'Neill v. Church's Fried Chicken, Inc., 910 F.2d 263, 266-67 (5th Cir.1990) (derivative suit). However, as the O'Neill opinion noted, any result that benefits the corporation benefits the shareholders. Id.
 
 
 27
 When there is a common fund created by a settlement, courts have applied one of two methods of determining reasonable attorney's fee awards: by a percentage of the fund, or by the lodestar method developed in the statutory fee shifting cases. See Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 853 (10th Cir.1993). We have recently implied "a preference for the percentage of the fund method" in common fund cases. Gottlieb v. Barry, 43 F.3d at 483. "In all cases, whichever method is used, the court must consider the twelve Johnson factors."[3] Id.
 
 
 28
 In reaching the fee award, it is not entirely clear whether the district court applied a lodestar or a percentage of the fund analysis.[4] The district court acknowledged that the essential focus was the value of the benefits achieved by plaintiffs' attorneys' efforts. The court stated that "the quantification of benefit in this case is exceedingly difficult." Appellant's App. 563. It noted the $3.5 million in insurance proceeds, enhanced by the $1 million deductible, then stated that it is difficult or impossible to quantify the benefits to shareholders of savings in brokerage fees,[5] and the benefit of the corporate governance procedures. The district court then stated that
 
 
 29
 there is a persuasive argument before me in the context of this case that at this phase of participation by class members, there is a rough benefit, which can be expected to be exceeded, of $15 million.
 
 
 30
 My rough calculation of the fee requested reflects that that would be about 16 percent of that estimated benefit.
 
 
 31
 The point of this exercise is this: The benefit is manifest, and given the manifest benefit I have no qualms or reservations in finding and concluding that benefit is substantial.
 
 
 32
 Id. at 564. The district court proceeded to consider each of the Johnson factors, and in the process referenced the time and labor, "a lodestar type of analysis." Id. In concluding that the proffered lodestar of around $780,000 was reasonable the court did not question plaintiffs' counsels' statement of the hours spent on the case and hourly rate figures averaging over $300 per hour ($185 to $450) for attorney time and paralegal rates as high as $125 per hour.[6] It applied the requested multiplier of approximately 3.16 to reach the $2,500,000 figure. Id. at 567. Thus, applying both the percentage of the fund and the lodestar analysis the district court somehow arrived at exactly the same figure, $2,500,000, the maximum fee plaintiffs' counsel said they might ask for in the settlement.
 
 
 33
 Plaintiffs argue that we may not review the district court's determination of the value of the settlement because only the attorney's fee issue is being appealed. Of course, the propriety of the settlement itself is not before us. But in setting its fee award the court extolled the value of the benefits to the shareholders/corporation and the class and used its findings to justify its attorney's fee award. Thus, the value is a relevant issue in this appeal.
 
 
 34
 We believe that properly analyzed this is not a common fund case and that the benefits secured to the corporation, and perhaps to the class members, are likely not worth the $15 million plus estimated by the district court.
 
 
 35
 We turn first to the derivative suit. In the notice to shareholders, "Answers to Questions You May Have About the Proposed Settlement," the only benefit stated was the new corporate governance procedures. Appellant's App. 318-19, 321. The court admitted this benefit was not quantifiable. Id. at 563. No new committees were established, only a commitment that for at least five years the existing Corporate Development and Finance Committee would review any sale or purchase of real estate involving $10 million or more, any leases with an annual rental of $1.5 million or more, and any "substantial or material diversification" of the corporate business, id. at 108; that the Public Policy Committee would make an annual review of all "significant governmental or regulatory proceedings" involving the corporation's real estate or transactions with affiliates and provide that information to the Corporate Development Committee, id. at 108-109; that the Human Resources Committee would review the effect of any "employment resizing programs" on corporate trust funds, id. at 109; and that the Audit Committee would at least annually review the corporation's discussion of its real estate portfolio as contained in its 10-K report to the SEC, review reserves established for employer resizing programs, and review the methodology used to determine the net realizable value of the corporation's real estate portfolio prepared by management, id.
 
 
 36
 As counsel for Russell pointed out to the district court, these are not extraordinary modifications; the committees apparently were in place as a result of a prior separate lawsuit. See id. at 406, 550. Although the corporate governance procedures in the settlement seem to us merely prudent safeguards any major corporation should have in place without the impetus of a lawsuit, whether this change was extraordinary and of special value should be established easily by the testimony of an expert familiar with other major corporations' governance provisions.
 
 
 37
 Apparently the only contribution to the corporation or the class by the individual defendant directors and officers was the $3.5 million their insurers paid to US West. We do not see how the district court considered this to be a contribution equal to $4.5 million; regardless of the deductible, the amount made available to the corporation to use or to help fund the expenses it incurred was $3.5 million. Although this money came into the corporate treasury, it might well be treated as simply a contribution to the costs of the suit; US West apparently assumed and paid some $3 million in administrative costs in connection with the settlement and the notices to class members and shareholders. See id. at 403. That expense is in addition to the $2.6 million attorney's fees and expenses the court ordered US West to pay. Thus, if these costs are balanced against the contribution from the insurance, viewing this as a derivative suit it is difficult to ascertain any net benefit to the corporation.
 
 
 38
 The third and final benefit to the corporation mentioned by the district court was the influx of capital from the stock purchases by class members under the settlement. The court appeared to believe this was unique, because it found the stock purchases benefitted both the corporation and the class members, a win/win situation with no detriment to anyone in the lawsuit.
 
 
 39
 The court made no finding that the corporation needed this influx of capital; but we may assume it did because US West apparently has in place a shareholder dividend reinvestment plan, id. at 135, 368, to continue to funnel new capital to the corporation. Of course, to the extent the corporation received less than the fair value for the shares sold to the class members it diluted the value of the stock held by the other common shareholders. It is also relevant to the value of this capital influx that other avenues were open to the corporation to obtain capital. Many corporations raise money by rights offerings to shareholders without brokerage fees and at discounts from market. Plaintiffs, in touting their success in the settlement, noted that a public offering would require the company to pay approximately $1 per share underwriting costs. This is close to the 3% discount the settlement offered the class members, considering that the stock apparently was selling for less than $50 per share. See id. at 297, 300. Thus, although the class members' purchases of US West stock brought an influx of capital to the company, from the record before us it does not appear the addition was less costly or more valuable than raising the capital by another method. Thus, any special benefit to the corporation resulting from the lawsuit seems illusory.
 
 
 40
 It appears from the record that the principal benefit of the settlement inured to the class members who were able to buy company shares at a discount from the market price. Even here the benefit does not appear to be huge. Class members were permitted to purchase shares directly from the company at a 3% discount, but only for up to one-tenth of the total number of shares they purchased during the approximately two year class period. Id. at 104, 296-97. Plaintiffs made much of the saving to small investors, because the class members did not have to pay broker's fees. But class members who bought less than twenty shares during the class period had no right to purchase stock under the settlement. If they sent in their application they were paid cash equal to the 3% discount for either one or two shares; i.e., apparently no more than $3 total. Class members entitled to purchase apparently were treated like those who participated in the dividend reinvestment program, except for the discount. Russell cited authority that rights offerings to shareholders without brokerage fees are common and often offered at a discount of 5% or more from the market price. Reply Brief of Appellant at 9-10. One objecting shareholder's letter in the record included a list of thirty-seven major corporations that offered their shares to their stockholders at a discount of 2 1/2 to 5% from market. Appellant's App. 354.
 
 
 41
 What makes the value of the discount to the class members reach a significant total is simply the size of the corporation and the enormous number of class members eligible to purchase. Apparently 24 million shares had to be offered. Id. at 300.[7] This fact obviously impressed the judge, who noted that for a corporation with 400 million shares outstanding and 899,000 record holders, "$2.5 million is like a grain of sand in the Sahara." Id. at 548.
 
 
 42
 The benefit of the settlement, we believe, inures almost entirely to the class members and comes from the value of the discount given those who were willing to buy more US West stock. There was no fund of money obtained for the class to share. Rather most class members had to pay the defendant corporation 97% of the market price for additional shares in order to realize any benefit. Cf. In re: General Motors Corp. Pick-Up Truck Fuel Tank Litigation, 55 F.3d 768, 802-03 (3d Cir.1995) (rejecting products liability class action settlement that gave each owner a coupon whose value could be realized only by purchasing a new truck). The only fund available to the class members to reimburse their lawyers in any sense arises from the $3.5 million contributed by the insurers of the individual defendants. The district court's order required that almost 75% of that be paid to the plaintiffs' attorneys.
 
 
 43
 We are satisfied that this is a common benefit, but not a common fund, case, and that a percentage of the fund approach is not appropriate. Thus, this is a case for application of the twelve Johnson factors. See Gottlieb v. Barry, 43 F.3d at 483. These attorneys are entitled to a fair fee for their services. We do not suggest that the fee analysis must follow the approach of the statutory fee cases like Ramos v. Lamm, 713 F.2d 546 (10th Cir.1983). Nevertheless, even though the amount of money that changed hands here is great, our conscience is shocked by an award of a 3.16 multiplier that results in a fee equal to more than $900 per hour for every attorney, paralegal, and law clerk who worked on the case.
 
 
 44
 Therefore, we must reverse and remand for further proceedings in the district court. We believe an evidentiary hearing is appropriate. The court may find it helpful to take evidence on the uniqueness of the corporate governance provision, on what are reasonable hourly rates for the attorneys in a case that does not produce a common fund, on whether the hours expended by counsel and their assistants were reasonable, and perhaps on other aspects affecting the appropriate fee award. We do not forbid some multiplier if there is evidence of something extraordinary in the results that was not apparent to this panel, or if one of the Johnson factors appears to demand it.[8] We hold, however, that the high dollar figures necessarily involved in a corporation of this size cannot justify a multiplier.
 
 
 45
 REVERSED and REMANDED.
 
 
 
 *
 The Honorable Edward C. Reed, Jr., Senior United States District Judge, United States District Court for the District of Nevada, sitting by designation
 
 
 [1]
 Russell appeals the district court's final order approving the settlement and awarding attorney's fees, as well as the order denying his "Motion for an Order Delaying Any Ruling on Plaintiffs' Attorney Fee Application and for an Order Granting an Evidentiary Hearing on Attorney Fees and his Motion for an Order Requiring Plaintiffs' Counsel to Produce their Time Records."
 
 
 [2]
 To have standing to sue as a representative plaintiff in a shareholder derivative action, a person must have owned stock at the time of the complained of acts (the "contemporaneous ownership rule"), and "must be a shareholder of the defendant corporation at the time suit is brought." Schilling v. Belcher, 582 F.2d 995, 999 (5th Cir.1978) (citing Fed.R.Civ.P. 23.1); see also Lewis v. Knutson, 699 F.2d 230, 238 (5th Cir.1983) (quoting Schilling ). "[I]t is generally held that the ownership requirement continues throughout the life of the suit and that the action will abate if the plaintiff ceases to be a shareholder before the litigation ends." Schilling, 582 F.2d at 999 (citing, inter alia, 7A Charles A. Wright et al., Federal Practice and Procedure Sec. 1826, at 325 (1972), and 3B Moore's Federal Practice p 23.1.17, at 23.1-63 (2d ed. 1978). To merely object to the settlement of a derivative action, however, the objector apparently need only own stock in the corporation at the time of the settlement hearing, and appear at the settlement hearing to raise his or her objections. Saylor v. Bastedo, 78 F.R.D. 150, 151-153 (D.C.N.Y.1978); see Bell Atlantic Corp. v. Bolger, 2 F.3d 1304 (3d Cir.1993); Webcor Electronics v. Whiting, 101 F.R.D. 461 (D.Del.1984); and 7C Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure Sec. 1839, at 182 (1986). Russell was a shareholder at the time of the acts and at all times thereafter. But in another case it is quite possible a shareholder who acquired stock after the acts occurred but before the settlement or fee hearing might be held ineligible for intervenor status
 
 
 [3]
 The Johnson factors include: "the time and labor required, the novelty and difficulty of the question presented by the case, the skill requisite to perform the legal service properly, the preclusion of other employment by the attorneys due to acceptance of the case, the customary fee, whether the fee is fixed or contingent, any time limitations imposed by the client or the circumstances, the amount involved and the results obtained, the experience, reputation and ability of the attorneys, the 'undesirability' of the case, the nature and length of the professional relationship with the client, and awards in similar cases." Gottlieb v. Barry, 43 F.3d at 482 n. 4 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974))
 
 
 [4]
 The district court stated that the trend in the field, and in this circuit, is to award fees "in cases of this nature" on a percentage basis, "but that begs the question of percentage of what." Appellant's App. 561. The court then stated that "I am cognizant that the lodestar method is one method to approach an award of fees, but the shortcomings of the lodestar method in a case of this nature are manifest, whereas its more reasoned application in statutory fee cases has greater benefit." Id. The court then listed the Johnson factors as appropriate to consider
 
 
 [5]
 The court acknowledged it would be easier to quantify the discount savings and purchase of stock after the offering ended, but it rejected the objector's request to delay the award until April 1994
 
 
 [6]
 The court stated that going through the billing sheets of counsel would not allow it to articulate the basis for the fee any better. Appellant's App. 570-71
 
 
 [7]
 Apparently only about 5.6 million shares were sold to class members, less than 24% of the offering. Brief of Plaintiffs-Appellees at 13-14 n. 6. We do not fault the district court, of course, for not waiting to see how many took advantage of the settlement offer. Nevertheless, the relatively small number is some indication that a large percentage of class members did not consider the settlement to have significant value
 
 
 [8]
 E.g., as to contingency, what were the prospects for a successful suit; can a law firm be justified taking a class action or derivative suit on contingency if the chances of recovery are significantly less than 50%; if the success is not significant should a reverse multiplier be applied