### In re HORIZON/CMS HEALTHCARE CORPORATION SECURITIES LITIGATION.

#### No. Civ 96–442 BB/LCS.

United States District Court,
D. New Mexico.

March 27, 1998.

---

Joseph Goldberg, John W. Boyd, David A. Freedman, Turner W. Branch, Albuquerque, NM, G. Paul Howes, Alan Schulman, San Diego, CA, Donald L. Perelman, Todd S. Collins, Genna Driscoll Kidd, Arnold Levin, Barbara Podell, Stuart H. Savett, Jeffrey W. Golan, Gerald J. Rodos, Leonard Barrack, Philadelphia, PA, Andrew Friedman, Phoenix, AZ, Stephen Lowey, White Plains, NY, Richard A. Lockridge, Gregg M. Fishbein, Jack L. Chestnut, Karl L. Cambronne, Minneapolis, MN, David Jaroslawicz, Joel B. Strauss, Frederic S. Fox, Robert C. Susser, Stephen D. Oestreich, Nadeem Faruqi, Klari Neuwelt, New York City, Dennis J. Johnson, So. Burlington, VT, Richard S. Schiffrin, Andrew Barroway, Bala Cynwyd, PA, Alfred G. Yates, Jr., Pittsburgh, PA, William M. Audet, San Jose, CA, for plaintiffs.

Martin K. Holland, Spencer Reid, Russell Moore, Charles A. Pharris, Rex D. Throckmorton, John M. Eaves, John G. Baugh, Amanda J. Ashford, Charles Robert Peifer, Albuquerque, NM, Andrew S. Montgomery, Victor R. Ortega, Santa Fe, NM, John Sullivan, Harvey Pitt, New York City, Karl Groskaufmanis, Washington, DC, Edward M. Pos-

ner, Philadelphia, PA, Christopher W. Byrd, Charles W. Schwartz, Houston, TX, Richard D. Milvenan, Barry D. Burgdorf, Austin, TX, for defendants.

## MEMORANDUM OPINION AND ORDER ALLOCATING ATTORNEYS' FEES

BLACK, District Judge.

Justice William Brennan once noted that disputes over attorneys' fees are "one of the least socially productive types of litigation imaginable." *Hensley v. Eckerhart,* 461 U.S. 424, 442, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (Brennan, J., dissenting). Unfortunately, after obtaining a good settlement for the shareholders, the present litigation has degenerated into the type of public spectacle which has fueled the perception that the practice of law is no longer a learned profession but rather just another lucrative business.

### Discussion

### I. *The Factual Background of the Litigation*

Horizon Healthcare Corporation, the predecessor to Horizon/CMS Healthcare Corporation ("Horizon" or the "Company"), provides acute rehabilitation and other services, long-term nursing care, contract rehabilitation, and other specialty healthcare services in several states. During the late 1980's, Horizon embarked on an ambitious plan of growth-by-acquisition, expanding from 15 facilities in 1987 to nearly 100 facilities by mid–1993. In 1995, it acquired Continental Medical Systems ("CMS") through a stock exchange. In November 1995, Horizon announced it would acquire Pacific Rehabilitation and Sports Medicine, Inc. ("Pacific Rehab").

In December 1995, Horizon issued a press release in which it reported "record" earnings for the second quarter ending November 30, 1995. Horizon's stock price climbed from $18 per share on June 6, 1995, to a high of $28–1/8 per share in January 1996. In early February 1996, *Business Week* reported that the Company had been overstating its operating income and that Horizon's historical results may have been inflated by aggressive accounting. Horizon's stock price dropped $2 per share, before the Company responded with a denial. On March 1, 1996, Horizon revealed that the Company earnings for the next two fiscal quarters would be significantly lower than had been projected. After these disclosures, the market price of Horizon's common stock fell $5.62, to $17.87 per share.

After the close of the trading day on March 15, 1996, Horizon disclosed that there was an on-going investigation of Horizon by the Office of the Inspector General and the Department of Justice stemming from alleged retroactive Medicare over-billings by a Company subsidiary. The press release issued by Horizon stated that the over-billings were estimated at $3,400,000. When trading resumed on Monday, March 18, 1996, Horizon's share price fell from approximately $16.25 to $12.75 per share. Over the following 90 days, the average price of Horizon stock was $13.87.

In April, Horizon announced that a planned $200,000,000 debt offering had been put on hold, and that the Pacific Rehab acquisition had been abandoned. Beginning on April 2, 1996, twelve lawsuits were filed in the United States District Court for the District of New Mexico seeking class certification on behalf of: (1) all persons who purchased Horizon's stock between June 6, 1995, and March 15, 1996, and who suffered a loss; and (2) those shareholders of CMS who acquired Horizon's shares on or about July 10, 1995, in connection with the acquisition of CMS.

The complaints allege, *inter alia,* that Horizon and certain of its officers and directors (the "Individual Defendants") violated the securities laws of the United States and New Mexico by disseminating false and misleading statements concerning Horizon and its operations, and that certain of the Individual Defendants had engaged in unlawful insider trading of Horizon stock, consisting of sales of over 1,500,000 shares for proceeds of approximately $40,000,000. The complaints seek relief on basically two claims: (1) that shareholders were not told about the retroactive Medicare billing investigation, and (2) that open market purchasers of Horizon

shares were deceived because the Company's business was deteriorating and the Company hid its problems until the insider sales were completed.

In accordance with the Private Securities Litigation Reform Act of 1995, 15 U.S.C. chap. 2A, § 77z–1, Plaintiffs' counsel placed notices on national business wire services and in national business publications. Motions for appointment of lead Plaintiffs and for approval of lead counsel were filed with the Court. A group of eighteen Plaintiffs in nine related actions representing 42,355 shares of Horizon stock (including that acquired in the CMS merger) and damage claims in excess of $200,000 proffered six representatives to be "lead Plaintiffs." With the exception of a group of the four firms which represented Plaintiff Barry Baskin (the "Baskin group"), all counsel for Plaintiffs joined in the motion to appoint lead Plaintiffs and for the selection of Milberg Weiss Bershad Bynes & Lerach LLP ("Milberg Weiss") and Barrack, Rodos & Bacine ("Barrack") as co-lead counsel.

Following a hearing on June 26, 1996, the Court consolidated the related cases and appointed the six proffered Plaintiffs as lead Plaintiffs to represent the interests of the Class.[1] The Court appointed Alan Schulman of Milberg Weiss as lead counsel for Plaintiffs and two local attorneys, David Freedman and one of the *Baskin* counsel, Turner Branch, as co-liaison counsel.

After Horizon settled the claims by the United States for the retroactive Medicare billings, HealthSouth Corporation became interested in acquiring Horizon. However, the pending legal action was a major impediment to such an acquisition. Horizon therefore approached lead counsel and negotiated a $17,000,000 cash settlement of the class action claims against Horizon only. The claims against the individuals were left pending but with high-low damage caps proposed. As part of the settlement, Plaintiffs and Defendants agreed to the certification of classes and submitted the Settlement Agreement to the Court for approval.

In the notice of the proposed settlement, lead counsel reserved the right to request up to one-third in attorneys' fees. Two of the largest class members, the State of Wisconsin Investment Board ("SWIB") and the Colorado Public Employees Retirement Association (collectively "State Funds"), objected and recommended 17.5% as the appropriate benchmark for attorneys' fees. Lead counsel requested attorneys' fees in the amount of 25% of the settlement recovery.

After reviewing substantial briefs and other submissions, the Court held a hearing on the settlement proposal on September 12, 1997. The Court recognized the Tenth Circuit Court of Appeals has expressed a general preference for awarding attorneys' fees through the percentage method[2] and adopted that over the lodestar approach.[3] However, the Court was also aware the Tenth Circuit had frequently approved a percentage substantially below the standard one-third contingency fee, and that it has required attorneys' fees have some correlation to the common benefit achieved for the Class.[4]

---

1. While it appears this "consortium" was constructed largely by counsel seeking the lead role in the litigation since none of the institutional investors anticipated by the Private Securities Litigation Reform Act materialized, this group was presumptively entitled to the lead role. Private Securities Litigation Reform Act, sec 101(a), § 27(a)(2)(A), 109 Stat. at 138 (1933 Act).

2. *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451 (10th Cir.1988). *See also Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991) (requiring percentage); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C.Cir. 1993) (same). For further discussion, *see* 1 Robert L. Rossi, Attorneys' fees § 6,9 (2d ed.1995).

3. The percentage method also seemed particularly apropos in the present case because of the large number of large firms from very disparate legal markets. *See In re United States Bioscience Sec. Litig.*, 155 F.R.D. 116 (E.D.Pa.1994). Unfortunately, the Court must now reconcile these very issues in order to resolve this fee allocation dispute.

4. *See, e.g., Rosenbaum v. MacAllister*, 64 F.3d 1439 (10th Cir.1995), a "common benefit" case requires consideration of the factors enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

After reviewing the affidavits submitted and considering argument of both Plaintiffs' counsel and those representing the State Funds, this Court set attorneys' fees at 20% of the net recovery after expenses. This percentage was thought most likely to both fairly compensate counsel as well as to reward them for their role in facilitating an early settlement which both benefitted shareholders and conserved judicial resources. Finally, recognizing that the style in which the attorneys travel and dine is a lifestyle choice not necessarily shared by the class members, the Court limited the attorneys to travel, meal, and hotel expenses at the United States Government per diem rate.

In November 1997, lead counsel submitted a proposed fee allocation dividing the $4,200,000 in attorneys' fees awarded by the Court between 24 law firms involved. It was accepted by all but one group of Plaintiffs' counsel in the class action. The four firms representing Mr. Baskin objected on the ground they were "frozen out" of a proper allocation of the legal work and thus the fees allocation. Other objections to the fee allocation came from the attorneys for the State Funds and those representing Ronald Gottesman in a parallel suit filed in the New Mexico State Court for the Second Judicial District.

## II. *The Baskin Counsel*

 Lead counsel initially designated eight firms to work on the preparation of the consolidated complaint, the preparation of the motion for class certification, and discovery requests. While each of these firms was assigned various tasks, the principal architects of Plaintiffs' case were the Milberg Weiss and Barrack attorneys. They had conducted the primary investigation which preceded the filing of the consolidated complaint, and were most responsible for responding to Defendants' motion to dismiss and for negotiating the Settlement Agreement with both Horizon and the Individual Defendants.

Other firms were also assigned work in each phase of the case. For example, the initial draft of the Class motion was assigned to *Baskin* counsel. After the tentative settlement was reached, Plaintiffs' counsel undertook to review 100 boxes of documents in Albuquerque. Attorneys from eight firms, including an associate in Mr. Branch's office, participated in this review.

Lead counsel represented eighteen shareholders representing 42,355 shares. The four law firms collectively representing Mr. Baskin sought damages based on his 395 shares. As noted earlier, the Private Securities Litigation Reform Act (the "Act") appears to reflect a congressional intent to transfer power from counsel who win the race to the courthouse to those shareholders who possess a sufficient financial interest in the outcome to maintain some supervisory responsibility over both the litigation and their counsel. Michael Y. Scudder, Comment, *The Implications of Market–Based Damages Caps in Securities Class Actions*, 92 Nw.U.L.Rev. 435, 437 (1997); Note, *Investor Empowerment Strategies in the Congressional Reform of Securities Class Actions*, 109 Harv.L.Rev.2056, 2058 (1996). While this Court is not persuaded the lead Plaintiff group forged in the instant case fits this model,[5] it is significantly more representative and influential than Mr. Baskin. Indeed, it appears on the surface that the four firms representing Mr. Baskin fit the profile sought to be "reformed" by the Act. S.Rep. No. 98, 104th Cong., 1st Sess. 14 at 6–10 (1995). For further discussion, see Richard Walker, *et al.*, *The New Securities Class Action: Federal Obstacles, State Detours*, 39 Ariz.L.Rev. 641, 642 (1997). Given the expression of congressional intent that significant investors be preferred and the fact that even before the passage of the Act, lead counsel in such class actions exercised near plenary authority,[6] the Court is reluctant to

---

**5.** Congress appears to have harbored the hope that substantial institutional investors such as the State Funds would advance their resources and expertise to fulfill this responsibility. *See* Harv. Note at 2058; Nw. Comment at 437. In this litigation, however, the State Funds declined to accept this role.

**6.** Such lead counsel have been recognized as having "substantial authority to conduct the litigation, even to the exclusion of other counsel."

attempt a detailed, retroactive analysis of the work allocation made by lead counsel. *See In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 328 (E.D.N.Y.1993) (allocation of lead ·counsel given deference).

In truth, it appears that the fortuitous timing of the merger, rather than the brilliant work of any of the attorneys, was most responsible for the substantial benefit accruing to the Class. This fact is especially significant considering the proposed fee allocation compensates Margaret and Turner Branch at $375 per hour, a rate received by few, if any, local attorneys on a routine basis. Moreover, the Milberg Weiss proposal then applies a lodestar multiplier of approximately 1.7 to the fees submitted by *Baskin* counsel. With two exceptions, this multiplier is larger than that received by the 24 other law firms seeking fees. Thus, the four law firms representing Mr. Baskin's 395 shares cannot argue they are not being well compensated or that their efforts produced unique value for the shareholders. Rather, they protest that other lawyers are getting a larger share of the "easy money." Everyone sees his own cause as just, but the Court is unpersuaded and unsympathetic. The $380,000 awarded the *Baskin* counsel represents the same dollar figure and both a larger hourly fee and a larger multiplier than that awarded the other liaison counsel, Mr. Freedman. It is legally and equitably adequate.

## III. *The Gottesman Fees*

■ Counsel representing Ronald Gottesman chose to file their lawsuit in New Mexico state court. The federal class action was broader because the *Gottesman* action could not assert claims under the Securities Exchange Act of 1934, 15 U.S.C. § 784, in state court. Like the *Baskin* case, the *Gottesman* action was brought on behalf of one small shareholder who had no standing to represent the aftermarket CMS purchasers of Ho-rizon. The initial advantage of filing such a claim in state court is that the Act does not apply and therefore discovery is not automatically stayed. Unfortunately, the *Gottesman* attorneys failed to vigorously pursue this advantage during the period in which the class action discovery was automatically stayed.

Once the settlement was proposed, Mr. Gottesman chose to remain in the federal class and avail himself of the settlement benefits. *Gottesman* counsel played no role in the preparation or settlement of the federal claims. In settling the state case, however, they agreed not to oppose the federal settlement. The fee allocation proposes they receive $121,500. While this represents a lower "hourly fee" than that awarded several other counsel, it does not appear unfair since their only concrete contribution was an agreement not to oppose a settlement their client had already accepted.

In the present case, *Gottesman* counsel are being compensated even though their suit was dismissed prior to judgment. A central rationale behind attorney compensation is the risk inherent in such cases. *Rosenfeld v. Black,* 56 F.R.D. 604 · (S.D.N.Y.1972). So even though the assumed risk materialized and their case was dismissed without achieving any legal purpose, *Gottesman* counsel are recovering $121,500. It surely seems appropriate to compensate other counsel at a higher rate for activities which proved beneficial to the common fund. *Wolf v. Frank,* 555 F.2d 1213 (5th Cir.1977); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680 (D.Minn.1975).

■ The *Gottesman* attorneys also seek $15,500 in payment of their expert and miscellaneous expense. Since the talisman for fees and costs in such a common fund case is benefit to the Class,[7] and the *Gottesman* counsel offer no evidence either expense made any such contribution, the costs will not be allowed.

Randell S. Thomas & Robert G. Hansen, *Auctioning Class Action and Derivative Lawsuits: A Critical Analysis,* 87 Nw.U.L.Rev. 423, 429 (1993); *see also* Manual for Complex Litigation § 20.22 (3d ed.1995).

7. "The key consideration in determining whether an award is justified is the value to the class of the legal work·performed for its benefit." *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1327 (2d Cir.1990). *See also In re Prudential Sec., Inc. Ltd. Partnerships Litig.,* 911 F.Supp. 135 (S.D.N.Y.1996); *In re·Prudential–Bache Energy Income Partnerships Sec. Litig.,* 1994 WL 202394 (E.D.La.1994).

### IV. *The State Fund Claims*

Counsel for the State Funds also seek compensation for their role in persuading the Court to reduce the percentage of attorneys' fees awarded from 25% to 20%. As noted earlier, this is a much more limited role than Congress hoped such institutional investors would assume or indeed than that shouldered by SWIB in other such litigation. *See, e.g. Gluck v. Cellstar Corp.*, Civ. 1353R (N.D.Tex.10/1/96) (SWIB sought and received role as lead plaintiff over individuals represented by Milberg Weiss); *see also Chan v. Orthologic Corp.*, Civ. 96–1514 PHXRCB (D.Ariz.12/19/96) (appointment of City of Philadelphia over group of individuals as lead plaintiff). This choice likely resulted from the State Funds' informed consideration of the potential downside risk of assuming the role as lead plaintiff. *See* Jill E. Fisch, *Class Action Reform: Lessons From Securities Litigation*, 39 Ariz.L.Rev. 533, 542 (1997). However, as in other areas of economics, minimization of risk leads to minimization of reward.

Having made the conscious decision not to seek the lead plaintiff role, the State Funds chose to challenge the attorneys' fees requested in this suit. While this could have been done with more legal and moral authority from the position of lead plaintiff, nonetheless, it provided a valuable contribution on behalf of the Class. The State Funds engaged counsel on a contingent fee basis, *i.e.*, counsel were only to be paid from benefits derived for the Class. According to the affidavits filed by the State Funds, their attorneys further agreed to advance all expenses including expert witness fees. Their counsel in turn employed Professor Robert Lamb from the New York University Business School and Kevin Dages, an economic consultant. Counsel for the State Funds then met with Alan Schulman of Milberg Weiss and Jeffrey Golan of Barrack, as representatives of the lead Plaintiffs. Schulman and Golan explained what they had done on behalf of the Class and apparently indicated a willingness to negotiate a fee of less than one-third. However, a dispute arose over the willingness of lead counsel to provide documents to the State Funds and the latter objected to the proposed settlement.

The State Funds' objection raised concerns about some of the procedural deficiencies in the settlement, but the primary basis of the objection was the amount of the lead Plaintiffs' proposed counsel fees. The Funds sought a reduction in those fees to 17.5% of the settlement. Following this filing, both the Plaintiffs and Horizon provided documents to the State Funds. Plaintiffs also sought and obtained documents from the Funds. On September 5, 1997, Plaintiffs' lead counsel filed a petition seeking attorneys' fees of 25% of the settlement amount.

The State Funds prepared and submitted a brief in opposition to Plaintiffs' fee request with supporting declarations. One of these declarations was from Dennis Lynch, Assistant General Counsel of Unisys Corporation, retained by the State Funds as an expert on attorneys' fees. The economic experts retained by the State Funds conducted a full-scale damage analysis which included extensive document review, consultation with counsel and the client, and preparation of documents and testimony. Counsel for the State Funds also produced documents and reviewed documents produced by Plaintiffs and Horizon and met with Plaintiffs' counsel as well as representatives of Horizon. Finally, at the September 12, 1997, hearing, counsel for the State Funds argued in support of a reduction in Plaintiffs' counsel's fees. This argument was successful as this Court reduced the fee award from the requested amount of 25% of the fund, or $5,250,000, to 20%, or $4,200,000. This decision was bolstered by the Court's reliance on the materials submitted by the State Funds.

■ Objectors who successfully challenge plaintiffs' attorneys' fees are entitled to an award of their attorneys' fees because their arguments have conferred a benefit on the class. *Gottlieb v. Barry*, 43 F.3d at 491 (remanded for entry of attorneys' fees because objectors' arguments "did in fact result in a reduction of certain fee and expense awards, and thereby benefitted the class"); *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir.1993) (affirming award of fees to objectors' counsel

based on benefit conferred to class). *See also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D.Ga.1993) (objectors awarded attorneys' fees because their arguments benefitted class).

In the *California Micro Devices Securities Litigation*, 168 F.R.D. 257 (N.D.Cal.1996), the Court explained why institutional investors, such as the State Funds, are in the most advantageous position to object to attorneys' fee proposals:

> [I]nput from actual class members ... has proven invaluable in assessing the true value of a settlement. It is no coincidence that this input has come from institutional investors; there are many reasons that such investors will be willing and able to monitoring [sic] attorney conduct in securities class actions much more rigorously than either figurehead plaintiffs or courts can do so. Institutional investors have financial interests in the outcome of securities class actions which dwarf the interests of individual plaintiffs, and with this increased financial interest comes an increased incentive to monitor class counsel's conduct of the action. Institutional investors, moreover, are much better situated to conduct such monitoring, both because they have greater resources and because, as repeat players in the securities class actions, they are experienced in the issues which these actions inevitably raise.

*Id.* at 275 *See also In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 886 F.Supp. 445, 457 n. 17 (E.D.Pa.1995) (individual plaintiffs not likely to challenge fee petition); *In re Oracle Sec. Litig.*, 131 F.R.D. 688, 689 (N.D.Cal.1990) (court loses the benefits of the adversary system once the case is settled).

■ In securities fraud litigation, the district court has a duty to review the method chosen to allocate attorneys' fees to ensure each attorney is compensated fairly in relation to the benefit they conferred. *In re Boesky Sec. Litig.*, 888 F.Supp. 551 (S.D.N.Y. 1995). However, once a petition to divide the common fund is filed, the court must assume the role of fiduciary and protect the beneficiaries against the claims of their counsel which are now, in a strict sense, adverse to those of the clients. *See Purdy v. Security Sav. & Loan Ass'n*, 727 F.Supp. 1266 (E.D.Wis.1989). *See also* Stephen A. Burns, Note, *Setting Class Action Attorneys' Fees: Reform Efforts Raise Ethical Concerns*, 6 Geo.J.Legal Ethics 1161 (1993).

■ The work of the counsel for the State Funds provided a useful, historical, and comparative backdrop so that the Court was not required to consider the request of lead counsel in a vacuum. As a result of the information provided by the State Funds, the Court not only concluded that the total attorney compensation should be reduced, but now also that the $537 per hour allocated by lead counsel to his firm and the Barrack fee is excessive given the fact the early settlement was driven by factors beyond their efforts. The Court therefore believes it is appropriate that the attorneys' fees of both Milberg Weiss and Barrack should be reduced by 3% and that this amount be awarded to counsel for the State Funds. This will reduce the fees awarded to Milberg Weiss by $58,650 and to Barrack by $20,700. Attorneys for the State Funds will therefore be awarded $79,350. The Court will therefore exercise its inherent equitable power to enter an order reallocating the attorneys' fees to more fairly distribute compensation based on benefits conferred on the Class. *See In re Air Crash Disaster, Florida Everglades*, 549 F.2d 1006 (5th Cir.1977) (district court has power to assess attorneys to compensate other attorneys for benefit provided the class); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir.1977) (same).

In all other particulars, the fee allocation proposal presented by Milberg Weiss is adopted.

## ORDER

For the reasons set forth above, the following attorneys' fees are awarded from the common settlement fund:

| | |
|---|---|
| Milberg Weiss | $1,896,350.00 |
| Barrack Rodos | 669,300.00 |
| Freedman Boyd | 380,000.00 |
| Branch/Alexander/Mogin/Sidener | 380,000.00 |
| Savett Frutkin | 180,000.00 |
| Kaplan Kilsheimer | 136,000.00 |
| Weiss/Stulll/Peifer | 121,500.00 |
| Grant & Eisenhofer | 79,350.00 |

1216

| | |
|---|---|
| Lowey Dannenberg | 75,000.00 |
| Zwerling Schachter | 75,000.00 |
| Faruqi & Faruqi | 50,000.00 |
| Berger & Montague | 30,000.00 |
| Schiffrin & Craig | 25,000.00 |
| Neuwelt, K. | 25,000.00 |
| Bonnett Fairbourn | 15,000.00 |
| Greenfield, H. | 15,000.00 |
| Wolf Popper | 15,000.00 |
| Lockridge Grindal | 10,000.00 |
| Chestnut & Brooks | 5,000.00 |
| Jaroslawicz, D. | 5,000.00 |
| Susser, R. | 4,000.00 |
| Johnson, D. | 4,000.00 |
| Levin Fishbein | 2,500.00 |
| Fine Kaplan | 1,000.00 |
| Yates, A. | 1,000.00 |